UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| KEVIN MACISAAC, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-118-CEA-HBG |
| | ) | |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Amended Referral Order [Doc. 66] by the District Judge.

Now before the Court is Defendant's Motion to Exclude Chuck Howarth and Dori Howarth as Experts in this Matter ("Motion to Exclude") [Doc. 53]. Plaintiff responded [Doc. 57] in opposition to the Motion. Defendant did not file a reply. Later, however, the parties filed supplemental briefs [Docs. 67, 68] after Defendant deposed Chuck Howarth and Dori Howarth. Accordingly, for the reasons explained below, the Court **DENIES** the Motion to Exclude [**Doc. 53**].

### I. BACKGROUND

The Court will first begin with the allegations in the Amended Complaint and then turn to the challenged opinions.

The original Complaint [Doc. 1] was removed to this Court on April 10, 2019, and amended on May 8, 2019. [Doc. 8]. The Amended Complaint states that Plaintiff was the named insured pursuant to a renewal insurance contract whereby Defendant agreed to insure the dwelling, other structures, and personal property located on the insured premises ("Insured Premises") [Doc. 8 at

¶ 4]. The insurance policy ("Policy") was effective September 24, 2016, to September 24, 2017. [*Id.*]. The Amended Complaint states that in addition to accidental physical loss to the dwelling located on the Insured Premises and for personal property, the Policy also provided coverage for debris removal, additional living expenses, damages to trees, shrubs, plants, and lawns. [*Id.* at ¶ 7].

The Amended Complaint states that on November 28, 2016, an accidental fire damaged and/or destroyed the dwelling and personal property located on the Insured Premises. [*Id.* at ¶ 11]. The accidental fire was the result of the Gatlinburg wildfires that struck the area. [*Id.*]. Plaintiff states that immediately following the wildfires, looters/thieves stole property from the Insured Premises. [*Id.* at ¶ 14]. Plaintiff reported the direct physical loss and the theft/vandalism (collectively, "Loss") to Defendant. [*Id.* at ¶¶ 15, 17]. Defendant separated the Loss into two claims: one for the wildfire and one for the theft. [*Id.* at ¶ 19]. Plaintiff alleges that while Defendant has acknowledged that the Loss is a compensable claim and made certain payments for the Loss, such payments were insufficient to indemnity Plaintiff pursuant to the Policy. [*Id.* at ¶¶ 20-21].

The Amended Complaint alleges that the parties dispute the amount of loss to the dwelling and the free-standing garage that was located on the Insured Premises. [*Id.* at ¶ 23]. In addition, the parties dispute the amount of loss to the damaged and/or stolen personal property. [*Id.* at ¶ 24]. In order to resolve the disputes, Plaintiff demanded an appraisal pursuant to the Policy and appointed Chuck Howarth ("Mr. Howarth") as the appraiser. [*Id.* at ¶ 25]. Mr. Howarth engaged Forensic Building Services ("FBS") to inspect and conduct soot and char sampling, which was sent to a qualified laboratory for testing. [*Id.* at ¶ 27]. FBS concluded that there was smoke, soot, and char consistent with a wildfire present in the buildings, wall cavities, and other locations. [*Id.*].

Based on the testing, FBS determined a protocol for repairs, which Mr. Howarth utilized to determine the amount of the loss. [*Id.*].

The Amended Complaint states that in response to the report by FBS and Mr. Howarth's determination regarding the amount of the structure loss, Defendant sent a hygienist to inspect the Insured Premises. [*Id.* at ¶ 30]. Defendant agreed to clean the basement area of the home but declined to move forward with the appraisal of the Loss. [*Id.* at ¶ 31]. In August 2018, Defendant acknowledged that the parties' experts agreed additional remediation was necessary because there was char present in the Insured Premises. [*Id.* at ¶ 32]. Defendant indicated that it would prepare an estimate for the cleaning as recommended by its expert, at which point it would then enter appraisal, if Plaintiff determined it necessary. [*Id.*].

The Amended Complaint states that on September 27, 2018, Defendant informed Plaintiff that it agreed to obtain estimates on the cost of cleaning, painting, and sealing the affected surfaces of the buildings, including all three levels of the home and the detached garage and that ServPro and Joseph Construction would assist with the estimates. [*Id.* at ¶ 33]. Later, however, in a letter dated October 5, 2018, Defendant advised that it had learned that Plaintiff sold the Insured Premises "as is" in June 2018, and as a result, Defendant would deny the claim. [*Id.* at ¶ 34]. Specifically, Defendant wrote as follows:

> Since you no longer own the property and have no property interest in it, you have no insurable interest in this property. Further, you have no basis to seek repair of property you do not own. Based on your sale of the property prior to initiating repairs for the claimed damages and your lack of an insurable interest, State Farm is closing its file as to this matter and there will be no further adjustment of this claim.

[*Id.*].

The Amended Complaint alleges that Defendant's denial and refusal to adjust the claim was wrong, inappropriate, and in clear violation of both the Policy and Tennessee law. [*Id.* at ¶ 35]. Based on the above allegations, Plaintiff alleges breach of contract and bad faith. [Doc. 8 at 7-13].

## B. Expert Opinions

Relevant to the instant matter, Plaintiff disclosed Mr. Howarth and Dori Howarth ("Ms. Howarth") (collectively, the "Howarths") in his expert disclosures. Plaintiff intends to offer the Howarths' opinions to show that the cost to remediate the property is approximately $178,548,15. Specifically, Plaintiff's disclosure states as follows:

> Mr. Howarth is the President of The Howarth Group and Dori Howarth is a Partner and Estimator at The Howarth Group who assisted with preparation of the estimate of the amount of the subject loss. Mr. Howarth was originally engaged prior to this litigation to serve as Plaintiff's appraiser pursuant to the Policy's appraisal clause and, thus, was not retained or specially employed for the purpose of providing expert testimony in this case. Mr. Howarth and Ms. Howarth worked together to determine the amount of loss caused to Plaintiff's property located at 1930 Backhome Lane, Sevierville, Tennessee ("Insured Premises") by the Gatlinburg wildfire. Both may testify in this case as expert witnesses as both of them inspected the subject buildings, scoped and investigated the damages to the Insured Premises and prepared estimates for necessary repairs and remediation to the Insured Premises. Mr. Howarth and Ms. Howarth are expected to testify that the fair, reasonable, and competitive replacement cost value of the necessary repairs and remediation to the structures at the Insured Premises are as set forth in their estimates, produced herewith. Their report and exhibits thereto are also attached to these disclosures. They are expected to testify to the scope and amount of loss, the method of the necessary repairs/restoration, and that the amounts set forth in The Howarth Group estimates are reasonable and necessary to accomplish the required work. They may also opine concerning the estimates produced by Defendant's adjusters or experts.
>
> Both Mr. Howarth's and Ms. Howarth's CVs and prior trial/deposition testimony are produced herewith. Neither has

authored any articles or publications in the past 10 years. Mr. Howarth's hourly rate for testimony associated with this litigation is $225.00 per hour and Ms. Howarth's is $225.00 per hour.

[Doc. 53-2 at 1-2].

In addition, the Howarths signed a letter, dated April 29, 2020, ("April Letter"), stating that they have prepared an estimate with regard to the necessary repairs and costs to bring the property back to the pre-loss condition. [Doc. 53-3]. The April Letter also states that the Howarths provided more recent estimates for the same scope of work using the updated Xactimate pricing index. [*Id.*]. The Howarths further state as follows:

> Based on our years of experience investigating, adjusting, and estimating insurance claims across the United States of America, we are also familiar with the standard of care applicable to insurance adjusters. To the extent relevant to our work and observations on this project and as set forth in the estimates referenced above, we are also prepared to offer opinions as needed and requested concerning the scope of repair and industry standards with regard to restoring this property to pre-loss condition with like kind and quality.

[*Id.*].

Defendant deposed Mr. Howarth on June 22, 2021. [Doc. 67-3]. Mr. Howarth stated that he intends to testify as follows:

> [Plaintiff's] residence was damaged, inundated by smoke and fire particulate, char, ash, that entered the home, coated everything inside ---walls, floors, ceilings, contends---and also got inside the interspatial cavities—inside wall cavities, ceilings cavities—and that the cost to restore the home on a very conservative basis is outlined in our estimate.

[Doc. 67-3 at 2]. Mr. Howarth testified that the Policy "is a replacement cost policy. Our estimate always starts on a replacement-cost basis." [*Id.*]. Mr. Howarth did not perform an actual cash value ("ACV") estimate. [*Id.*]. Mr. Howarth also relied on the test results from FBS, which showed the quantity of particulate in the home. [*Id.*].

5

Defendant also took Ms. Howarth's deposition on June 22, 2021. [Doc. 67-4]. Ms. Howarth testified that at some point after she wrote the first estimate, she and Mr. Howarth did a walk-through of the property, which took about one to two hours. [*Id.* at 2]. She testified that in terms of creating the pricing, she relied on Xactimate. [*Id.*]. Ms. Howarth stated that she and Mr. Howarth arrived at a replacement cost value ("RCV") and that they did not form any opinions as to the ACV of the property. [*Id.*]. Ms. Howarth did not rely on the report from FBS in creating the estimate. [*Id.*].

## II.    POSITIONS OF THE PARTIES

Defendant moves [Doc. 53] to exclude the Howarths from testifying at the trial in this matter because they did not comply with Federal Rule of Civil Procedure 26(a)(2) and Federal Rule of Evidence 702. Defendant explains that in November 2016, Plaintiff submitted a claim under his Policy for damages occurring at the property caused by the wildfire. Defendant states that it issued applicable payments under Coverage A – Dwelling, Coverage B – Personal Property, and Coverage C – Loss of Use of the Property. Defendant states that it paid Plaintiff approximately $53,000.00. Defendant states that in 2018, Plaintiff submitted a new claim requesting that Defendant make additional repairs to the property. On March 26, 2018, Plaintiff, through Mr. Howarth, invoked the appraisal provision of the Policy and submitted a demand for $178,403.00 worth of additional repairs. Defendant states that it began an investigation and hired an industrial hygienist, Charles Caudill ("Caudill"), to inspect the property and determine what cleaning, if any, needed to be completed. Caudill determined that there was a negligible amount of smoke impact and recommended minimum cleaning and no remediation methods of the home interior that involved destructive materials. Defendant states that Daire Workman ("Workman"), an employee of ServPro, went to the property to determine the cost of cleaning, but he could not get in because

6

Plaintiff had sold the property without informing Defendant. Workman examined Caudill's estimate and determined that the cost to remediate the property was $2,846.49.

With respect to the instant Motion, Defendant argues that the April Letter, with the attached Xactimate, fails to provide a complete statement of the Howarths' opinions. In addition, Defendant states that the April Letter fails to identify the basis, facts, methods, theories, techniques, and data considered and used by the Howarths in reaching any opinions. Defendant states, therefore, the Howarths' opinions are unreliable.

In Response [Doc. 57], Plaintiff states that Defendant made payments, but the payments were insufficient to fully mitigate the damages caused by the wildfires. Plaintiff states that to resolve the amount of loss in dispute, he demanded appraisal of the differences pursuant to the Policy. Plaintiff retained FBS to inspect and conduct soot and char sampling to be sent to a qualified laboratory for testing. The results revealed that smoke, soot, and char were in the structures, wall cavities, and other locations. Based on the testing, FBS determined a protocol for the repairs, which the Howarths utilized to determine the amount of the loss. Plaintiff states that Defendant agreed to obtain estimates of the cost of cleaning, painting, and sealing the affected surfaces, but Defendant later denied covering such costs, claiming that Plaintiff sold his home "as is."

Plaintiff states that the Howarths were not specially retained under Rule 26(a)(2)(B), so an expert report is not required. Plaintiff states that in any event, the Howarths' April Letter, exhibits, and qualifications demonstrate that their opinions and testimony are reliable and admissible. Plaintiff states that the Howarths prepared an expert report based on their experience and included three exhibits. Exhibits A and B are reports formulated using Exactimate software, which is the most prevalent claims-estimating software used by insurance companies across the nation and

which provides line-by-line itemizations of necessary repairs and costs of the same. Plaintiff states that Exhibit C is the curriculum vitae of the Howarths. Further, Plaintiff argues that the Howarths' opinions are based on their experience and the reliable methodology of Exactimate software, which is the same software that Defendant used in this case.

Defendant did not file a reply brief but filed a Supplemental Brief [Doc. 67] after taking the Howarths' depositions. Defendant states in addition to the above reasons, the Court should also exclude the Howarths from testifying because their opinions are not helpful. Defendant argues that the only relevant measure of damages in this case is the ACV loss that Plaintiff sustained. Therefore, Defendant contends that Howarths' opinion regarding the RCV is irrelevant and not helpful because Plaintiff did not make repairs or replace any items.

Plaintiff filed a Response [Doc. 68] to Defendant's Supplemental Brief, arguing that Defendant is wrong. Plaintiff explains that in order to calculate the ACV, an individual must first calculate the RCV. In addition, Plaintiff states that this Court recently found Mr. Howarth to be qualified and that his opinions are reliable. Further, Plaintiff argues that the issues raised by Defendant in its Supplemental Brief impact the weight of the expert testimony and not its admissibility. Finally, Plaintiff argues that the prevention doctrine prohibits Defendant from asserting that the RCV is not the appropriate measure of damages in this case.

### III. STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)). Specifically, Rule 702 provides as follows:

8

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors

9

"are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Moreover, the Supreme Court has explained that in determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Id.* at 592–93. "Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (citing *Heller,* 167 F.3d at 153).

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

10

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## IV.    ANALYSIS

Accordingly, for the reasons set forth below, the Court finds Defendant's Motion to Exclude [**Doc. 53**] not well taken, and it is **DENIED**.

First, Defendant argues that the Howarths should be excluded from testifying at trial because they did not submit a completed expert report pursuant to Rule 26(a)(2)(B). In a similar vein, Defendant states that the Howarths' expert disclosure does not meet the requirements under Rule 702 because it does not provide a complete statement of their opinions and it fails to identify the basis, facts, methods, theories, techniques, and data considered and used by the Howarths in reaching their opinions. Defendant, therefore, concludes that the Howarths' opinions are not reliable and should be excluded.

Plaintiff responds that the Howarths are not specially retained experts subject to the expert disclosure requirements in Rule 26(a)(2)(B), and therefore, they were not required to submit an

11

expert disclosure. Plaintiff states that he appointed Mr. Howarth as his appraiser when he invoked the appraisal provision in the Policy.

The Court will begin with Rule 26(a)(2)(B), which states as follows:

> **B)** *Witnesses Who Must Provide a Written Report*. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> **(ii)** the facts or data considered by the witness in forming them;
>
> **(iii)** any exhibits that will be used to summarize or support them;
>
> **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

Rule 26(a)(2)(C) establishes the disclosure requirements for expert witnesses who are not required to provide a written report. Under Rule 26(a)(2)(C), however, a disclosure must still report the "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). "Rule 26(a)(2)(C) is meant to apply only to so-called hybrid witnesses, *i.e.,* fact witnesses who can also provide expert testimony.

12

*Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 363 (W.D. Ky. 2020) (quoting *Deere & Co. v. FIMCO Inc.*, 239 F. Supp. 3d 964, 979 (W.D. Ky. 2017)) (other citations omitted).

Courts have further explained the distinction between retained and non-retained experts as follows:

> In order to give the phrase "retained or specially employed" any real meaning, a court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony. It is this difference, we think, that best informs the language of the rule.

*Id.* (quoting *Deere & Co.*, 239 F. Supp. 3d at 980) (other citations omitted). A retained expert "comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)." *Id.* (quoting *Deere & Co.,* 239 F. Supp. 3d at 980).

The Court has considered the parties' positions and finds Defendant's request not well taken. As mentioned above, Defendant asserts that the Howarths did not submit a complete expert disclosure under Rule 26(a)(2)(B), while Plaintiff contends that the Howarths are not subject to Rule 26(a)(2)(B). Specifically, the Policy states as follows:

> 4. If you and we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, disinterested appraiser. Each shall notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire. The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they

13

> shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and compensation of the umpire shall be paid equally by you and us.

[Doc. 67-1 at 16].

Plaintiff appointed Mr. Howarth, relying on the above provision prior to filing his lawsuit. Given the circumstances of Mr. Howarth's appointment during the attempted appraisal process, the Court finds that the Howarths are not subject to Rule 26(a)(2)(B). The Court finds, however, that the Howarths are subject to Rule 26(a)(2)(C). *See Talon Aerisyn, LLC v. Selective Ins. Co. of S.C.,* No. 1-18-CV-36-TWP-CHS, 2019 WL 5686915, at *5 (E.D. Tenn. Aug. 26, 2019) (finding that an appraiser's opinion was subject to Rule 26(a)(2)(C)).

As mentioned above, pursuant to Rule 26(a)(2)(C), Plaintiff's disclosure of the Howarths' opinions must provide the subject matter on which they expect to testify and a summary of the facts and opinions to which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(C). In his disclosures, Plaintiff only provided the subject matter of which the Howarths intend to testify. A summary of topics that the expert intends to testify does not meet the requirements of the Rule. The Court notes, however, that the Howarths also submitted the April Letter and a detailed estimate of the restoration. *See Talon Aerisyn,* 2019 WL 5686915, at *5 (finding that an appraiser's opinion was subject to Rule 26(a)(2)(C) and that while his disclosure was inadequate under the Rule, the appraisal he prepared supported his opinion and therefore was sufficient to allow him to testify). Accordingly, the Court finds that Plaintiff's disclosure of the Howarths' opinions, the April Letter, and the detailed estimate meet the minimum requirements under Rule 26(a)(2)(C).

14

In a similar vein, Defendant argues that the Howarths' opinions do not meet the requirements of Rule 702 because the April Letter fails to identify the basis, facts, methods, theories, techniques, and data considered and used by the Howarths' in reaching their opinions. The Court disagrees that such information has not been provided. During the appraisal process, Mr. Howarth engaged FBS to inspect and conduct soot and char sampling, and Mr. Howarth used the protocol for repairs by FBS to determine the amount of the loss. [Doc. 67-3 at 2] (Chuck Howarth's Deposition) (explaining that he relied on the FBS test results). *See Kush Enterprises, LLC v. Massachusetts Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263, at *8 (E.D. Tenn. July 15, 2021) (explaining that Mr. Howarth's reliance on the FBS report was permissible because Mr. Howarth formulated an independent remediation plan based on industry standards to return the properties to pre-loss condition and estimated the associated costs and Mr. Howarth was permitted to rely on another expert's opinion) (internal quotations omitted). Further, as explained in the April Letter, the Howarths relied on Xactimate pricing index. *See id.* ("To estimate the costs, Mr. Howarth used Xactimate, a program that other courts have found reliable under Rule 702."). Finally, as explained in the April Letter, the Howarths relied on their experience with investigating, adjusting, and estimating insurance claims. *See* [Doc. 53-3] (the Howarths' qualifications). The Court finds that the Howarths are qualified to render such opinions based on their extensive experience in this area.

Finally, Defendant argues that the Howarths' opinions are not admissible because they are not helpful in this case. Specifically, Defendant states that the Howarths offer the RCV estimate, but the only relevant estimate of damages is the ACV that Plaintiff sustained. In support of its position, Defendant states that Plaintiff admitted that he did not complete the repairs, extend any

15

money to make those repairs, or have any out-of-pocket repair expenses. Defendant states that Plaintiff sold his home "as is," and therefore, the only relevant measure of damages is the ACV.

Plaintiff responds that to calculate the ACV, one must first calculate the RCV. In support of his position, Plaintiff cites to the deposition testimony of Defendant's Rule 30(b)(6) witness, Joseph Cary ("Cary"), who testified that in order to arrive at the ACV, one must calculate the RCV. Plaintiff states that Defendant is welcomed to apply the same depreciation percentage to the Howarths' RCV calculations, or the Howarths could adopt Defendant's depreciation percentage, or testify as to their own opinion about the appropriate depreciation (if any).

During Cary's deposition, the following exchange occurred:

> Q. Do you remember – and we've got it – remember, it's one of the – the policy is already an exhibit. We can look at it if we need to. Do you recall whether or not it's an ACV or an RCV policy?
>
> A. Well, it's –it's an ACV policy with a replacement cost provision.
>
> Q. What is –what—explain for the jury what ACV and RCV mean?
>
> A. ACV is Actual Cash Value.
>
> Q. Okay.
>
> A. It's replace -- RCV is Replacement Cost Value.
>
> Q. Uh-uh (affirmative).
>
> A. In order to get ACV, you calculate the replacement cost of -- of an item and apply depreciation based on its agent, condition, and when you apply the depreciation, subtract it from the RCV, you arrive at your actual cash value.
>
> Q. And a policyholder, particular under the policy that is applicable –that—that was on the MacIsaac's property, does

16

>> not have to repair or replace the property in order to be paid
>> the actual cash value amount; correct?
>
> A. That's correct.

[Doc. 68-1 at 2].

In light of Cary's testimony, the Court declines to exclude the Howarths' opinions at this time. The Court finds Defendant may cross examine the Howarths as to why they did not provide an ACV or Defendant could simply apply the same depreciation percentage to the Howarths' RCV calculations, as Plaintiff has welcomed.[1] Defendant states that the jury will be misled into believing that the Howarths' estimate is the proper measure of damages, though it is not allowed under the Policy. The Court finds that Defendant's concerns can be alleviated through cross examination and the presentation of any contrary evidence.

## V. CONCLUSION

Accordingly, for the reasons stated above, Defendant's Motion to Exclude Chuck Howarth and Dori Howarth as Experts in this Matter [**Doc. 53**] is **DENIED.**

**IT IS SO ORDERED.**

ENTER:

*Bruce Guyton*
United States Magistrate Judge

---

[1] Plaintiff also states that the Howarths could also testify as to their own opinions about the appropriate depreciation, but they have not disclosed such opinions in accordance with Rule 26(a)(2)(C).